If the court please, my name is Lennis Carman. I appear before the plaintiff's appellants. Because of hearing difficulties, I would ask the indulgence of the courts to have my associate, Stanley Friedman, stand by me to assist me if I have trouble hearing. That would be just fine, of course. Thank you, Your Honor. If the court please, I believe the basic question in this case is, how does cutting a $200 million in programs in the Medicaid program protect and maintain the Medicaid program of the great state of California help to prevent cuts? The Attorney General has never answered that question in its briefs, and I'm hoping that one of the three justices here will ask that question of the Attorney General. Proceeding into the merits of the case, we really have before us a common and an uncommon case. It's common because all the states are doing this. It's uncommon because California is the only state that has a governor who has posted and stated in his website that a $500 million reserve has been created. Excuse me, counsel. Counsel, this is Judge Smith. Where in your filing with the district court did you provide any evidence that a rainy day fund had been established? Not specifically. Could you hear me? Yes, yes. But I'm proceeding on the basis that in preliminary injunctions, the state of the facts and the law applicable as of the date of the request for the emergency relief. That's really not the case. You're asking us to overturn the action of the district court. We have to determine whether the district court has abused its discretion based upon well-known principles of equity. And one of the things that we look at is what was before the district court. Isn't that correct? That's correct, Your Honor. At the same time, there are really two issues that are before the court at this present time. One, there is a state of a state of the record in the district court as of September 1, August 19. But at the same time, this is a preliminary injunction to determine whether the rulings of the court in the district court were correct. And if they were not, that we should have interim relief in the interim to protect irreparable injury in here. Okay. Let me interrupt for just a moment, if I may. Yeah. And this remains on the rainy day fund question. My understanding of what the district court did was that the court denied on the merits the request for a preliminary injunction as to count one. As to count two that involved the rainy day fund, she dismissed but with permission to amend the complaint. Now, I don't know that the rainy day fund is in front of us because the district judge did not give a final judgment as to the rainy day fund. Well, because the court erred in dismissing on the basis that there were no allegations of a rainy day fund. We specifically allege. But let me interrupt. Yes. She dismissed with permission to amend. Okay. And so long as a permission to amend is on the table, we do not have a ruling from that judge that I think we can review. Is that correct? No, that is not correct in this particular case upon this particular fact. Because? Because the case cited by the attorney general only applies when the permission to amend is to amend to better state the case which was before the court and which the plaintiffs pleaded. Here we pleaded a supremacy clause case. The court said, we're not going to proceed on this anymore. I'm not going to permit you to proceed on the supremacy clause case. You haven't stated a supremacy clause case. You have stated a private right of action case. You can only proceed on a private right of action case. That's 1983. I don't want to go back to last year and plead a 1983 case because I'll lose. She's asking me to plead a case that she wants me to plead. I say I have a right to plead the case that I want to plead. And if I'm finally terminated in pleading that case, which is a supremacy clause case, that's a final judgment and order against me. That's my position. Okay. On that point. But to go back to my point about the common and the uncommon, the governor has boasted of the $500 million reserve. And because of that, we have a favorable ruling. No other state is going to ever reveal or boast that it has a $500 million reserve. And instead, they will go back to doing the reserves in the old-fashioned way, which is simply to overbudget. If there's an item of $1 billion, they'll budget $1.25 billion so that the reserve does not appear on the surface. And, in fact, even as we stand, the state has been doing that and has admitted so in the papers filed by the attorney general the other day. She pointed out that there was a $1 billion revenue shortfall, but the same page shows there was a $600 million reduction in expenditures over what was budgeted. So that's overbudgeting there of $600 million in the first quarter, which is $2.4 billion reserve being created secretly by not stating that it's reserved by the simple old-fashioned way of overbudgeting. On the assumption that the rainy day fund question is in front of us. Yes. What you've alleged is that the state has saved money because of these cuts. Yes. And that that money has gone into a fungible fund. I think those are your words, fungible fund. What is the definition of rainy day fund such that deposit of monies into something that's fungible constitutes a rainy day fund? A rainy day fund is any unappropriated amount in the general fund of the state. And the $500 million reserve that the governor spoke of was unappropriated because it had been appropriated, but he vetoed $500 million, so that left that amount unappropriated. So that's reserved. So on your definition of rainy day fund under the federal statute, any time there is any unappropriated money, that money has to be spent on Medicare or rather on Medicaid? If it's a fund created by the by, in this case, the 3.3 billion FMAP funds. And by the but-for reasoning, if there's any unappropriated amount of $500 million, then it has to come from the 3.3 billion FMA extra funds because without it, the state would have a $2.5 billion deficit. And so the surplus of $500 million unappropriated was created by the 3.3 billion FMAP, just as the $2.5 billion unappropriated, well, reserve that I just spoke of that the state is already creating for this fiscal year, by over-budgeting, comes from the 3.3 billion surplus. So I would amend my definition to not only unappropriated funds, but over funds which have been over-appropriated so as to create a secret reserve fund. And in my pleading, I said, and these funds all go into the general fund as a fungible fund. At the end of the year, all of them, which are on an unexpended, drop back into the general fund. And so it's a reserve. Now, the other thing is that were we to prevail only on the – $500 million reserve, and also the new evidence produced by the attorney general that because of revenue shortfalls that fund has been spent, that means that this fiduciary has spent this $500 million on other funds than Medicaid. So that's under old-fashioned analogy would be misappropriation of the $500 million by the fiduciary of the state having spent the reserve. So the fact that the state has a great shortfall and they've spent the reserve is no defense. It's an omission. I think I'm correct that under your definition of rainy day fund, the state is required to spend all of the federal money on Medicaid, and any portion of that money that is not spent on Medicaid constitutes money set aside for a rainy day fund. Is that correct?  Senator Grassley pointed out that all the FMAP funds, which are spent – extra funds which are spent to relieve the state of its FMAP duty cause a dollar-for-dollar saving to state funds. I'm saying that the statute extends to the saved state funds, not just the FMA funds, which we concede were spent for Medicaid purposes. But in doing so, they freed up $3.3 billion of state funds. And Senator Grassley pointed it out. He just says, let's not kid ourselves. This is a statute to fund the states and give them money to spend on whatever they want. And he wanted a clause that would limit them. And so they amended it to include the express purposes clause, which wasn't there before, and answered Senator Grassley's complaint in which I say it requires the state, the court, in my view, to find that there has been a rainy day fund expended. And the state has a duty to use all of the saved state funds on the Medicaid program. And as a fiduciary, the state in this case has not explained or shown that it has done so. Instead, all it does is show that $3.3 billion has been received. Let me interrupt you for just a moment. You've got just under three minutes left. Yes. Let me ask the other judges first whether they have any questions before you reserve the remaining time. We can just wait for the remaining time. Thank you for asking. Why don't we hear from the other side and then you have some time remaining. That's fine, Your Honor. Thank you very much. Thank you. Good morning. May it please the Court. My name is Karen Schwartz, Supervising Attorney General. And if you could please keep your voice up. And I'm appearing, I will, Your Honor. I'm appearing on behalf of the Department of Health Care Services, its director, David Maxwell Jolly. I'm going to just take off where the other side left off. The burden, of course, is on the plaintiffs to show that we're not spending the money for Medicaid purposes, not on the state to show that we are. But, in fact, we met that burden even if it had existed. We put in a declaration of Mike Genest, the Department of Finance, that stated specifically that all monies were being spent on Medicaid. And that's the nature of the program, actually. This isn't an allocation. Ms. Schwartz? Yes, Your Honor. Could I ask you a question? My understanding is that that evidence was put in in your appeal to us, but not at the district court. Is that correct? No, that's not correct. The declaration of Mike Genest was submitted to the district court, and the district court specifically found, and this is in the excerpt of record at 64-63, cited our evidence and found no evidence that we were reserving ARRA funds. Okay. And the plaintiffs put in no evidence to the effect that there was a Rainy Day Fund. Is that right? That's correct. We put in evidence that there was no money in the fund. They put in countervailing evidence. We also put in evidence and sworn testimony that all funds that we're receiving under ARRA for this purpose are being spent for Medicaid purposes. And if I could just elaborate. So basically that is uncontroverted evidence as before the district court. Is that correct? It is, Your Honor. And I would submit that it's even uncontroverted on appeal, although I agree with Your Honor's analysis of the fact that at issue is the district court. But I would point out that they've testified that the budget provides for a reserve, but that is a budget is an aspirational document. The documents that we submitted on Monday showed the reserve is still empty and that, in fact, the state has $16 billion of borrowing. I have another quick question here. I apologize. And then I'll turn it over to Judge Fletcher.  to assist the states in complying with ARRA. What is the position of the state as to what deference, if any, we owe to that agency in construing ARRA? That's a great question. And turn to the letters. Yeah, that's a great question, and I think it has an easy answer. Very strong deference. And the reason for that is that there's a lot of evidence in the statute at issue that Congress intended for CMS to implement the statute. And it's not just in Section 501G, which we cite in our papers, which actually requires us to submit reports to CMS, but it's also in 5007, which we haven't mentioned to date, but which is part of the same set of enactments, which actually appropriates approximately $40 billion specifically to the Secretary of Health and Human Services, under which CMS operates, for oversight and implementation of ARRA. So this is the agency that has been designated authority for implementing ARRA. And let me just say, the record doesn't begin to show the amount of communication that's been going on between California and the Secretary and all the other states and the Secretary and CMS on these issues. The states have been asking for guidance all along. We asked for guidance before we enacted this statute. And so the FAQs that you see are just the tip of the iceberg in terms of communications with CMS. But the CMS guidance memos were drafted, I think, in response to all the questions that the state had. If we cannot rely on Congress's express wording and on the CMS guidelines that were issued over the course of several months, then Chevron is a dead letter. And I submit that's not the case. These are on point. They're highly detailed. They address all of the issues that plaintiffs have identified. And honestly, plaintiffs haven't suggested that they don't, just that they're not entitled to deference. But I do want to make a point about how ARRA funds work. We don't get a $3 billion grant. What happens is we have to spend a dollar to receive not even a dollar. We receive less than a dollar. It's more like 60 cents. Before ARRA we received about 50 cents. So if I am on Medi-Cal and I go to get a service and it costs $10, California pays $10 to the provider and then goes and draws down, as I believe the technical term, its matching federal percentage. So by definition the money has been spent on a Medicaid purpose and then we are reimbursed for part of it. And there is no slush fund. There's no giant fund of untapped money. It's all being spent. Let me ask you this, if I can. It's a variation on the question I asked before, and that is the district court dismissed would leave to amend the portion of the complaint, this is account two, directed to the Rainy Day Fund. As far as I can tell, there has been no attempt to replead that count and there has been no final judgment entered by the district court as to that count. The district judge, when it denied the preliminary injunction, denied it only as to count one and dismissed, as it were, received the possibility of an injunction when count two was amended. Does that mean that the Rainy Day Fund question is in front of us or is it not in front of us? I believe it actually is in front of you, and here's why. The preliminary injunction order actually addressed both causes of action. In the first cause of action, she found no obstacle between the state statute and the purpose clause. And with respect to the second cause of action, she found no obstacle that the state statute didn't pose an obstacle with respect to the reserve fund claim. And the reason why there was no preemption, among other grounds that she cited, but there was no obstacle, is that the statute itself doesn't discuss how funds are to be deposited. If there is a state official who is receiving these ARRA funds and depositing them in the wrong way, then the cause of action is to enjoin that state official, but it's not to enjoin a statute that itself doesn't direct how the funds are to be deposited. There's a very big disconnect between the relief that plaintiffs are seeking and their theory of preemption, and the court addressed that in her order. In the second half of the order, the court said, for the same reasons that I've analyzed by both of their preemption claims fail in connection with the preliminary injunction, those preemption claims fail for the same reason in connection with the motion to dismiss, and so she didn't rehash all of that. But she said that, well, you know, maybe what they're trying to say is that the state has violated the no reserve fund portion of ARRA. And if that's the case, that's a claim directly under ARRA, and I don't know if they want to make that claim or not, but I'm going to let them make that claim if they choose to. But if they do, they need to be cognizant of the fact that the defendants may argue that you have to satisfy the Gonzaga 1983 requirements. So that's what happened in the district court. But that suggests to me that she's saved out the possibility of a ground on which she may rule that there's been a violation of the rainy day fund requirement. Well, she allowed them to replead, but Your Honor's question was whether in reviewing whether today both of the issues are in play, and since you are permitted an interlocutory order from a denial of a preliminary injunction, and since she reached both issues in the preliminary injunction, I do believe both issues are before the court. Okay. Thank you. Let me just address a couple of quick issues. In order to find preemption, there must be both an obstacle to the congressional purpose and clear and manifest intent to supplant state law. Neither of those requirements is met, and they are two separate requirements. A mere obstacle is not sufficient. With respect to the obstacle, the point I'd like to make here is that the claims have focused on a couple words in ARRA, but in fact we see ARRA's purposes expressed throughout the statute. In the brief that we submitted yesterday in connection with our request for judicial notice, I identified four different places, the preamble of ARRA, three of ARRA, Section 5000 of ARRA, and actually the title of Section 5000, that all talk about the purposes of ARRA being to provide fiscal relief for the states, stabilize the states' budgets. That was an overriding purpose of ARRA. We don't see preservation of Medicaid benefits in those provisions. What we see is to provide fiscal relief to the states. In fact, ARRA Section 3 talks about stabilize the states' budgets in order to minimize and avoid reductions in essential services and counterproductive state and local tax increases. These are optional benefits, Your Honor. Under the Medicaid Act, as you know, we are required to provide seven services. That's mandated. But then there are other services, like the services at issues here, that is up to the state to whether or not to supply them. These are not by definition essential services as described in Section 3 of the ARRA Purpose Clause. Now we have the- Counsel, did the plaintiffs at any point question before the district court whether the services that were terminated were optional? Did they claim that they were mandatory services at any point? No, they have not. They have consistently characterized these in their briefing as optional services, and that issue is not in dispute. What is your position with respect to the Purpose Clause? Is it correct to say that the state takes the position that it is precatory language only has absolutely no force of law? It is precatory language, aspirational language, and to the extent that there were an ambiguity in the statute, it could provide some assistance to the court in construing the statute. But the language that they're focusing on does not create a mandate. And Congress knew how to create a mandate. So there's no preemptive effect in any way? Not on its own, absolutely not. And we would point out that there are multiple Purpose Clauses here, and you can't focus on one purpose to the exclusion of all others. We have used the funds. This state law is an example of using the funds to help stabilize our budgets. Budget cuts are painful and horrible, and I am glad in this day and age that I am not a legislator having to make those decisions. But in this case, this was a policy decision the legislature had to make in connection with stabilizing our fiscal resources. And beyond that, we've used the ARRA funds to help preserve the Medicaid fund. There's no dispute about that. But for the ARRA funds, the cuts that we would have had to do as a state facing billions and billions of dollars of deficits and borrowing would have been far greater. We preserved eligibility. No one is going to lose eligibility for Medicaid as a result of any steps that we've taken since the ARRA funds became available. And we've preserved the many optional benefits, these benefits for some people, as we've described, pregnant women, people in long-term health care facilities, but also a $3 billion prescription drug benefit, which the feds do not require us to provide. Let me just talk briefly about that. Counsel, does the record reflect whether the state legislature was aware of the provisions of ARRA when they passed this AB3, I mean, X35? Yes, it does. The declaration of Toby Douglas talks about the negotiations that led up to the passage of ARRA and talks about the fact that there are three ways to restrain spiraling Medicaid costs. And our program has gotten bigger, because more and more people need Medicaid. And so we're actually spending more than we were. But setting that aside, so in his declaration, he talks about the fact that there are three ways you can do it. You can reduce eligibility, but we couldn't because of ARRA. You can reduce provider rates, but there were the injunctions that called that into question. And so that left us with one final choice, which was optional benefits. And beyond that, let me say, again, that this is not in the record, but there were many communications with CMS before the statute was enacted to discuss what ARRA provides. And what is in the record is we were not the only ones. Every state in the country is facing similar problems and responding in similar ways. And so as a result, we got the two FAQs, the guidance memorandum that we provided to the court. Let me just very briefly, because I know my time is getting ‑‑ talk briefly about the fact that there's no clear and manifest purpose of Congress state law. Now, Congress attached strings to the enhanced FMAP. No question, certain mandatory provisions. They told us that we couldn't restrict eligibility. We've complied with all of the mandatory provisions. Congress did not, and it knew how to do so, tell us that we had to maintain our coverage of optional benefits. And, in fact, they rejected a proposed amendment that would have accomplished exactly the result that plaintiffs seek here. You know, the states fundamentally, we need to be able to rely on the information that we receive from CMS. And we've relied on that information in our budgeting. If the court holds that this provision is preempted, the result, or if an injunction were to issue, which is more to the point today, that would create a huge unfunded liability. It would further destabilize the state's budget. It wouldn't advance ours purposes, but defeat it. Unless there are further questions, Your Honors will submit. No further questions from the bench? Thank you very much. Mr. Carman, you have saved time. Right. I want to attack three of her claims. The last one, I hope briefly. She says that an injunction will create a huge crisis of an unfunded mandate. I just explained to the Court in the opening argument that own documents show there's an underexpense of $600 million a quarter, which is $2.4 billion a year, which is a reserve, which are funds which were budgeted and are available for this measly $200 million program of state funds. So it's false to claim that, like Chicken Little, that the roof was going to fall down. Then secondly, as to the optional benefits, we've always said these are optional benefits, but the ARA Title V is not expressed in terms of optional benefits. It says that it shall apply to all Medicaid programs as of July 1, 2008, and these optional benefits were part of the California Medicaid program as of July 1, 2008. So the ARA applies to it. And secondly, I pointed out that it couldn't possibly apply to any other than optional programs because all the other programs are mandatory, so they can't cut those and keep the Medicaid program. So if they keep the Medicaid program, the only ones that can be cut are the optional. So ARA, by definition, as a practical matter, applies to all optional for those two reasons. But then lastly, I want to hit hard their claim that they have proven that they have applied these funds to the Medicaid program. First of all, the legislative analyst in his report, which we asked for judicial notice, pointed out that the AAR Title V freed up millions of funds that would otherwise be spent for other state uses. So that shows an intent on the part of the legislative analyst who officially advises the legislature. And then secondly, who do you believe the most? The Attorney General, the audits of the federal government, AOJ, or Mr. Genest. The AOJ report that we put into evidence in the request for judicial notice says that California officials told us that this would free up funds for uses other than Medicaid. So that's evidence that the funds were being used for other than Medicaid. And then thirdly, Mr. Genest has only one sentence in his entire declaration that enhanced FMA funds were being used for Medicaid program. He has one sentence that says the enhanced FMAP has been used to fund the Medicaid program. Well, Your Honor, that's not evidence. That's just a conclusion not based on any evidence for which if he had any evidence, there's a rule of evidence that if he had evidence to support that statement in his possession, he would have produced it. And since he didn't produce it, he doesn't have any evidence of that. So that statement must be rejected. And all of counsel's statements that these good things have occurred based on Mr. Genest's statements must be rejected. And then also, Your Honor, you have this. I want to make this one last point. And that is that in every balanced budget, you have a balance of revenues appropriated and revenues anticipated. Say in a $100 billion budget, if you had $20 billion in Medicaid funds and you accounted in the $3.3 billion enhanced FMAP, then you could say that all the enhanced FMAP was by the fungible funds outlook. It could be claimed to be expended for the Medicaid program. But let's say the state cut the Medicaid program. Mr. Chairman, let me interrupt. You're two minutes over time. If you've got one last thought with which you would like to leave us, please feel free. Okay. Well, I just want to finish that one thought. Okay. And that is that if the state cut the Medicaid budget in half the next year and they had a balanced budget, the same situation would occur. The $3.3 billion would be claimed to have been used to fund the smaller Medicaid. But on that line of reasoning, they can cut the Medicaid program any amount they want so that the purpose of the clause of Title V becomes meaningless. And if there is any meaning to the purpose of the clause, it means that when they have $3.3 billion in enhanced FMAP funds and they have a program that only costs $2 million, then as a fiduciary, they have to expend that money on that program. Okay. Good. I think we understand that point. Thank both sides for your helpful arguments. The case of Gray Panthers of San Francisco versus Schwarzenegger is now submitted for decision. I shouldn't say the case. The emergency motion for stay is now submitted for decision. Thank you. Thank you very much. We are now in adjournment.
judges: Reinhardt, Fletcher W. , Smith M.